Filed 9/7/21  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD JAKE SMITH,<br><br>    Defendant and Appellant. | D076849<br><br><br>(Super. Ct. No. SCE378134) |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed as modified.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury convicted defendant Ronald Jake Smith of 13 counts of lewd acts on a child. The victims of Smith's offenses were his stepdaughter and daughter. On appeal from the judgment, Smith raises six arguments.

First, Smith contends that the trial court erred when it concluded that a prospective juror's comments during voir dire did not taint the entire venire. He argues that the trial court's error is structural and requires reversal of the judgment. Second, Smith contends that the trial court denied him the right to present a full defense when it excluded certain evidence regarding Global Positioning System (GPS) information from his work truck and evidence of referrals to Child Welfare Services (CWS) unrelated to the charges at issue in this case. Third, Smith claims that the trial court abused its discretion in admitting expert testimony regarding common behaviors of child molestation victims, known as child sexual abuse accommodation syndrome (CSAAS).

Fourth, Smith contends that the trial court erred when it instructed the jury with CALCRIM No. 1193, which is the pattern instruction on CSAAS evidence. According to Smith, the instruction informs the jury that it may consider CSAAS testimony as evidence that the defendant committed the charged offenses. Fifth, Smith contends that the cumulative effect of the errors that he has identified warrants reversal of his conviction.

Finally, Smith contends that the trial court violated his right to due process when it imposed various fines, fees, and assessments without first determining his ability to pay.

We conclude that Smith's arguments on appeal are without merit. However, we also conclude that a recent ameliorative amendment to the law

2

entitles Smith to have vacated any portion of the fee imposed pursuant to Government Code section 29550 that remained unpaid as of July 1, 2021. We therefore vacate the unpaid balance of this fee, and otherwise affirm the judgment as modified.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *The victims*

Victim S.S. is Smith's youngest child. She was born on March 10, 2011 and was eight years old at the time of trial. Smith had three children, including S.S., with his ex-wife, N.B., and shared custody of his children with her.

Victim J.T. was born on April 14, 2003; she was 15 years old and in tenth grade at the time of trial. Her mother, A.S., met Smith in February 2013, and A.S. and Smith were married in August 2013.

2. *Smith's abuse of victim J.T.*

J.T. reported that Smith touched her inappropriately many times— more times than she could count. She explained that Smith had touched her vagina, skin to skin, with his hand. On some occasions, Smith inserted one or two fingers inside the lips of her vagina and rubbed it. J.T. felt pain in her vagina. Smith touched her vagina both over and under her clothing. Although J.T. testified about certain instances of abuse that she remembered, she also testified that she found it difficult to remember other specific occasions when Smith had inappropriately touched her because, she explained, "so many of them happened it's just hard to remember everything." J.T. did not want Smith to touch her, and she did not feel safe or comfortable at home. J.T. felt so uncomfortable that she packed a bag with

a change of clothes and necessary toiletries "just in case [she] needed to leave at any given moment" because she was "scared that something would happen to her." J.T. thought about "[c]alling the police" or "telling somebody" about the abuse, but she "was just too afraid to do anything."

a. *Abuse that occurred at the Old Highway 80 House*[1]

While J.T., her mother and Smith were living in the Old Highway 80 House, J.T. was in junior high school. The school day ended at around 1:30 p.m. For most of the time the family lived in the Old Highway 80 House, Smith worked for a "company called Aztec Fire and Safety." He ended his work day earlier than A.S. did, so he would often pick up J.T. after school using his work truck.[2] Smith would sometimes pick up J.T. from school, and other times from the Boys & Girls Club. Smith's mother would occasionally pick up J.T. after school as well.

Smith first touched J.T. inappropriately around Christmas when J.T. was 10 or 11 years old and in fifth or sixth grade, which was while they were living in the Old Highway 80 House.[3] After Smith brought J.T. home that afternoon, she was on the couch watching television. No one else was present. J.T. was lying on the couch when Smith sat next to her. He touched her vagina with his fingers. He did not say anything to J.T., and she did not

---

[1] J.T.'s mother explained that in June 2013, she, J.T. and Smith moved into a home "off of Old Highway 80." We will refer to that home as the "Old Highway 80 House"

[2] A.S. testified that she would not arrive home from work until "[a]t least 6 o'clock, if not later."

[3] J.T. had previously indicated to a child abuse detective with the San Diego Sheriff's department that Smith first touched her around "Christmastime," when she was in sixth grade and was 11 years old.

say anything to him. After Smith touched her, he went out to the garage and put up Christmas decorations.

During the two to three years that J.T. lived at the Old Highway 80 House, Smith touched her at least once a week. On those occasions, Smith would touch J.T.'s vagina or thighs. On the occasions on which Smith would touch J.T.'s thighs, he often approached her while she was sitting on the couch watching television. Smith would put his hand on one of her inner thighs, near her vagina, and "m[ad]e his way up." On the occasions when Smith would touch J.T.'s vagina, he would touch her both over and under her underwear. Smith used his fingers and moved them. He would touch the outside and the inside of her vagina. Specifically, J.T. testified that Smith touched inside of her vaginal lips. J.T. sometimes felt pain, but she did not tell Smith.

Sometime after Christmas in late December 2014 or early January 2015, J.T. told her mother about Smith touching her. They were at Smith's mother's home when this initial disclosure took place. The disclosure began when J.T. told A.S. that her vagina was hurting. When A.S. asked her whether anyone had touched her, J.T. told A.S. that Smith had been touching her. J.T. believed that her vagina was hurting because Smith had touched her recently. J.T. did not provide her mother with any details about the touching because J.T. did not want to talk about it. A.S. did not ask for details about the touching because she was upset. Despite J.T.'s disclosure that Smith had been touching her, A.S. and J.T. continued to live with Smith for another eight to ten months.

Shortly before October 2015, J.T. called A.S. while A.S. was out shopping. J.T. asked A.S. to "please come home" because she was " 'really upset and uncomfortable.' " A.S. immediately left the store. When A.S.

arrived home, J.T. said that Smith was "finding reasons to be close to her and trying to touch her," making her "very uncomfortable." A.S. told J.T. that she would "do something" and "figure it out." A.S. testified that still did not ask J.T. for details about why she was uncomfortable because she did not want to believe "something so horrific could be happening to [her] daughter."

In October 2015, J.T. and her mother moved out of the Old Highway 80 House and into a small "granny flat" in Lakeside. J.T. did not want to move, but she did not want to continue living with Smith. When J.T. and A.S. moved, J.T. felt relieved, but Smith continued to contact A.S. and tried to reestablish a relationship with her. A.S. began to believe what Smith told her. She testified that she did not want to believe that Smith had abused J.T. and she loved him. During the few months that J.T. and A.S. lived apart from Smith, they did not discuss the abuse that J.T. had disclosed.

b. *Abuse at the Lakeside Condominium*[4]

A.S. and Smith reunited in December 2015. Soon after that, A.S. and J.T. moved into the Lakeside Condominium with Smith. The three of them lived there for about three months.

While the three were living at the Lakeside Condominium, Smith again began his abuse, touching J.T.'s vagina while she sat on the couch in the living room. J.T. testified that Smith touched her either once or twice—she was not sure. Smith touched her in the same manner, by touching one of her inner thighs and moving his hand up, using his fingers to touch her vagina. He touched her thigh at least once and her vagina at least once.

---

4    At some point in late 2015 or early 2016, A.S. and J.T. moved with Smith into a condominium in Lakeside, which we will refer to as the Lakeside Condominium.

c. *Abuse at the Gotta Place House*[5]

In March 2016, J.T., A.S., and Smith moved into the Gotta Place House. J.T. was in seventh grade at this time. She would sometimes attend drama practice at around 1:30 p.m., after she was released from classes. J.T. recalled that, during this time, either Smith or Smith's mother would pick her up from school at around 2:00 p.m. However, according to A.S., because J.T. was uncomfortable being around Smith, J.T. would often get a ride home from a friend, whether or not she had drama practice after school. Nevertheless, A.S. acknowledged at trial that even though Smith would typically not pick up J.T. up from school while they were living at the Gotta Place House, there were "maybe . . . a couple of occasions" on which Smith picked her up. Further, Smith continued to arrive home from work before A.S. did.

J.T. testified that while they were living in the Gotta Place House, Smith continued to touch her thigh and vagina, "always" while she was on the couch in the living room. She explained that generally, he would place his hand on one of her inner thighs, and then move his hand up, until he was eventually touching her vagina with his fingers, both over and under her clothing and underwear. J.T. said that Smith touched her in the afternoon while they were alone in the house, or while his three children were in their bedrooms. Smith touched J.T.'s thigh and vagina more than once at the house on Gotta Place.

d. *J.T.'s disclosures to others*

At a birthday sleepover at the Gotta Place House, when J.T. was turning 14, she told her friend R.Y. about the abuse. J.T. told R.Y. that

---

[5] In March 2016, J.T., A.S., and Smith moved to a home on Gotta Place, which we will refer to as the Gotta Place House.

7

Smith had touched her inappropriately and "gestured" with her hand and head toward her vagina. R.Y. understood J.T. to be indicating that Smith had touched J.T.'s vagina. J.T. was very upset, appeared scared, and cried when she disclosed the abuse to R.Y.

A few months later, J.T. noticed Smith outside her window looking in at her, and she felt uncomfortable. J.T. contacted R.Y. and asked if she could spend the night at R.Y.'s house. R.Y. and her father picked up J.T. and took her to their home. While there, J.T. told R.Y.'s mother that Smith looked at her inappropriately and "creeped her out." J.T. did not provide details about the inappropriate touching because she was worried about her mother and Smith's children. J.T. cried and appeared upset throughout the conversation, but she did not seem to want to disclose much information. J.T. showed R.Y. and R.Y.'s mother a video that she indicated showed Smith outside of her window. R.Y.'s mother testified that she could see a shadowy figure in the video. R.Y.'s mother offered to call the police, but J.T. indicated that she did not want such a call to be made; she was worried about disturbing her family, ruining her mother's marriage, and possibly being taken away from her mother.

In October 2017, J.T. was interviewed by a protective services worker who was investigating claims of abuse involving Smith's daughter S.S. J.T. had never spoken with Smith's children about the fact that Smith had been touching her inappropriately. She was also not aware that Smith had been accused of sexually abusing S.S., and had heard only that "family court" was involved. J.T. disclosed to the protective services worker the sexual abuse that Smith had been committing against her. A few days later, A.S. and J.T. moved out of the Gotta Place House.

8

3. *Victim S.S.*

J.T.'s mother A.S. explained that when S.S. was four or five years old, she began taking showers instead of baths when at the home Smith shared with A.S. A.S. was aware of two or three times when Smith had S.S. shower with him. In addition, Smith would help S.S. when she showered, and he would sometimes close and lock the door to the bathroom while he was in the bathroom with S.S., explaining that he was using the bathroom and wanted privacy.

S.S. testified that Smith began touching her in her "crotch area" or "private part," starting when she was four years old. Smith touched S.S. only when they were in the bathroom in the "master bedroom" where she took showers. S.S. indicated that Smith helped her take showers and that both Smith and S.S. were nude while in the shower.

S.S. testified that she felt sad when Smith took showers with her. When she saw Smith's body parts in the shower, S.S. felt sad because "it wasn't right." S.S. told her mother N.B. that she did not want to shower with Smith; she cried about it. N.B. called Smith and asked him to let S.S. shower with her older sister instead of with Smith; N.B. told Smith that S.S. did not like showering with him. According to N.B., Smith yelled at her and told her that he was the parent and that it would be "gross" to have S.S. shower with her older sister. N.B. called CWS to report Smith's showering with S.S. because she did not think it was appropriate, and S.S. was "crying real hard" and "really adamant that she did not want to shower with him anymore." N.B. believed "there was nothing else that [she] could do to protect [S.S.] from . . . having to shower with [Smith]."

A protective services worker from CWS interviewed S.S. in September 2017; S.S. disclosed that Smith had rubbed her vagina with his hand. S.S.

9

explained that on one occasion, after S.S. was done showering, Smith dried her off in the bedroom. S.S. told the investigator that Smith rubbed her "private part" with his hand, and she indicated to the investigator by pointing to her "genital area," i.e., her "vagina." S.S.'s sister walked by when Smith was touching S.S. Smith began "screaming at [S.S.'s sister] really bad." S.S. indicated to the investigator that Smith touched her inappropriately on more than one occasion.

S.S. testified at trial that she felt scared and nervous while testifying at the preliminary hearing. She saw Smith "shake his head at [her]" while she answered questions, which made her feel sad, and it felt to her "kind of like a 'don't.'" This made S.S. feel afraid to answer questions. When asked at trial whether she was afraid of Smith, S.S. replied, "Yes." When asked why, she said, "I don't know." She confirmed that she was "telling . . . the truth here today."

4. *Expert testimony regarding misconceptions about child sexual abuse victims*

The prosecution called Jayme Jones, a clinical psychologist, as an expert. The expert testified that many child victims of sexual abuse never say anything about the abuse; victims also often delay disclosing and do not reveal that abuse occurred until years or decades later. She testified that it is a myth that abused children "immediately tell what happened and that when they tell, they tell it in a very coherent, beginning-to-end fashion." Children who have been or are being molested by strangers are more likely to disclose the abuse immediately than are children who are molested by people they know. The expert explained that in some situations, a child is afraid to disclose because the abuser has threatened the child or a family member.

According to the expert, children tend to be more likely to disclose to friends than to adults. Children who have been abused multiple times may

10

consolidate their memories of the abuse, and it is therefore more difficult for these children to remember specific or smaller details about any particular instance of abuse.

5. *The defense case*

Smith testified that his ex-wife, N.B., repeatedly tried to take their children away from him. She filed requests for emergency court hearings as part of her efforts.

When Smith began a relationship with A.S., J.T.'s mother, he was working at Aztec Fire. Smith denied that he ever touched J.T. inappropriately, and specifically denied that he did so when they were home alone after her school day ended, as J.T. testified. Smith initially denied having picked up J.T. from school, but eventually admitted that he had picked her up from school a few times a week while they were living at the Old Highway 80 House.[6] According to Smith, at the time he began his relationship with A.S., his work day ended at around 3:30 p.m. When Smith was later promoted to the role of superintendent at Aztec Fire, he left work at around 4:30 p.m. Smith claimed that he did not leave at 1:30 or 2:00 p.m. unless there was an emergency or a doctor appointment. He explained that when he subsequently began working as a superintendent at Cosco Fire in 2015, he left work at around 4:30 or 5:00 p.m. He asserted that it took about an hour for him to get home. Smith acknowledged that A.S. would not arrive home until around 6:00 p.m., but he denied that he was at home with J.T. for a couple of hours before A.S. would arrive. After J.T. made the first disclosure to her mother, Smith and A.S. agreed that Smith would no longer pick up J.T. from school.

---

[6] Smith indicated that his mother also would pick up J.T. from school during this time period.

11

With respect to his relationship with J.T., Smith testified that J.T. "never really wanted anything to do" with him and that she "always had a chip on her shoulder." J.T. did not care about his opinion, and seemed to want him to give her money. According to Smith, he and J.T. would argue over her dresses and shorts, which he viewed as "too short." Smith believed that J.T. lied "all the time."

Smith stated that he showered with S.S. only once, when she was three or four years old. According to Smith, they were in a hurry to go somewhere, and that is why they showered together. Sometime after he showered with S.S., he received a phone call from a protective services worker who asked him about it. After that call, Smith would only assist S.S. in the shower, and did not shower with her again. He generally kept the bathroom door open, but admitted that he would close the master bedroom door because his son was a teenager and Smith did not want his son to see S.S. naked. Smith denied that he locked the door to the bathroom. Smith stated that he would dry off S.S., and make sure that all of her body parts were dry, including her "butt" and "vagina." He denied ever having rubbed S.S.'s vagina with his hand.

Smith called other witnesses in his defense. K.P. testified that she had known Smith for approximately 18 years at the time of trial. They had gone to high school together. She indicated that she had never witnessed Smith behave inappropriately with her children or with any other children. M.B. testified that he had known Smith for approximately two years at the time of trial and had never seen Smith behave in a sexually inappropriate manner with Smith's children, stepdaughter, or other children. Smith's mother also testified that she had never seen Smith behave inappropriately with his children or with J.T.

B. *Procedural background*

In April 2019, an amended information was filed charging Smith with 13 counts of lewd act on a child (Pen. Code, § 288, subd. (a)). Counts 1 through 12 related to victim J.T., and count 13 related to victim S.S. The information also alleged, with respect to all 13 counts, that Smith committed the offenses against more than a single victim (§ 667.61, subds. (b), (c), (e)). In addition, the information alleged that Smith had substantial sexual conduct with the victim with respect to counts 3, 4, 5, 6, 11, 12, and 13 (§ 1203.066, subd. (a)(8)).

A jury found Smith guilty of all charges, and found true the enhancement allegations.

The trial court sentenced Smith to a term of 30 years to life in prison. The total term consisted of a term of 15-years-to-life on count 1, 11 concurrent 15-years-to-life terms on counts 2 through 12, and a consecutive term of 15-years-to-life on count 13.

Smith filed a timely notice of appeal.

III.

DISCUSSION

A. *The trial court did not err in ruling that the venire had not been tainted*

Smith contends that the trial court erred when it determined that a prospective juror's comments made during voir dire did not taint the entire venire. According to Smith, the court's error deprived him of his right to trial by an impartial jury, and constitutes structural error, requiring reversal of the judgment.

1. *Background*

During voir dire, in the presence of all of the potential jurors, the trial court asked Prospective Juror No. 73 (Prospective Juror 73) about her occupation. Prospective Juror 73 stated, in relevant part:

> "I'm a retiree, 13 years now. My husband lives with me. He's a retired attorney, just retired. We have two children: one is 59. He's a chemical engineer working for Clorox in Pleasanton, California. Our second son is an electrical engineer who is 49.
>
> "I have no prior jury experience, and you'll understand why in a minute. I have no friends who are in law enforcement currently. My husband's family has all been sheriffs, attorneys, judges, et cetera. My husband was a practicing attorney here in San Diego County until just this year. He retired.
>
> "I have – I don't know if you would call it a victim of a crime, but I was sexually assaulted by a family member from the age of 10 to 16, and it was not a crime at that time because that was so long ago. I'm 82 so fortunately today we can penalize these people.
>
> "I have had a family member arrested. That was probably 53 years ago. I won't say who it is, not me. I do follow the law. I've been in the legal field since 1958. Used to be City Attorney's secretary here for Lynn MacDougal who is the El Cajon City Attorney. I worked for lawyers from Luce Forward on, and the last 20 years I did the contracts for Grossmont Cuyamaca Community College District because I had so much legal experience.
>
> "As far as being fair and impartial, I have to tell you that I think children do not lie. And as far as verifying what's been said, I don't know how that's possible when it is one person's word against another. But I would believe the children, and I could not be fair and impartial. If someone is sexually assaulting a child, in my opinion, they should be taken out in an alley and shot."

14

At that point, the trial court interrupted Prospective Juror 73 and asked her to describe her occupation. Prospective Juror 73 responded, "My occupation was about one-third education. I work[ed] for San Diego State. I worked for Grossmont Cuyamaca. I worked for the Claremont colleges. I worked for legal fields -- in the legal field as a legal secretary from 1958 in Seattle, you know, on down to San Diego. And I would say my experience is about one-third legal and about one-third business and about one-third education."

Following further questioning from the court, Prospective Juror 73 indicated that she could not be fair. On her way out of the courtroom, Prospective Juror 73 said, "I don't know how a person like this can be put on trial."

After Prospective Juror 73 left the courtroom, defense counsel requested a conference in chambers. Once in chambers, defense counsel argued that Prospective Juror 73's comments—in particular the "comments that she made about anyone being accused of child molest should be taken out and shot" could have "tainted the entire panel." The court agreed with defense counsel that it was unfortunate that the juror had been so outspoken, but indicated that the court was not "inclined to take any further action." The court explained, "[T]he jurors know the difference between these charges and -- not charges. They have their opinions. I don't think they are so malleable that they are going to buy everything [Prospective Juror 73] says."

When voir dire resumed, defense counsel addressed the venire, saying, "Now, we all heard [Prospective Juror 73]. [Prospective Juror 73] said that people accused of crimes like Mr. Smith has been accused of should be taken out and shot. Anyone agree with that?" Prospective Juror No. 48 (Prospective Juror 48) indicated that he agreed with Prospective Juror 73's

15

comments and explained, "I come from a country where like -- like we are very -- how to explain it? [¶] Sometimes we feel like laws are unfair, so we like to make justice on our own hands. So people are violently coerced criminals or what you think is a criminal. I was raised as like someone rape somebody or something and people catch them, they could get -- like if the people get to them before the police. So it is a common practice where if a criminal gets caught by the people --[.]" Defense counsel interjected and asked the juror whether it was likely that he would believe that Smith was guilty based only on the charges, and without hearing the evidence. Prospective Juror 48 responded, "Well, now here we follow a different system where you're presumed innocent and all of this stuff. You have to follow the rules. We have similar rules, but it is the culture of the people. So I was raised for 14 years on that culture too, so." Defense counsel asked Prospective Juror 48, "But you don't disagree with [Prospective Juror 73]?" Prospective Juror 48 said, "No, not 100 percent."

The trial court indicated that the court was not clear as to the juror's position and asked him whether he agreed with Prospective Juror 73 as to the appropriate punishment if a defendant is guilty or "no matter what[.]" Prospective Juror 48 acknowledged that "rapists and stuff like that" do not get the death penalty. As Prospective Juror 48 discussed what happens "if" someone did "something bad to somebody" in his country, the court interjected and emphasized that it would have to be "if" the person had done a bad act and only "if" the person was guilty. The juror agreed, and the court impressed upon him that his role was to determine whether the defendant is guilty or not, and not to decide the punishment upon a guilty finding. The juror indicated that he understood, and that he would make a decision based upon the evidence presented.

The prosecutor asked Prospective Juror 48 whether he would follow the law as explained by the trial court, and whether he would disregard the laws of Colombia, his country of origin. While Prospective Juror 48 clarified that his prior comments were based on his belief in "harder punishment," he confirmed that he understood that his role as a juror was to listen to the evidence to reach a verdict and not to consider punishment.

Defense counsel challenged Prospective Juror 48 for cause. Counsel argued that Prospective Juror 48 could not be fair and impartial due to "cultural biases" that he might be unable to overcome, arising from his life in Colombia. The prosecutor disagreed with defense counsel's assessment of what Prospective Juror 48 had said. The trial court denied defense counsel's challenge to Prospective Juror 48 for cause. Defense counsel subsequently used a peremptory challenge to excuse Prospective Juror 48.

2. *Analysis*

"*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.)

We review for an abuse of discretion a trial court's denial of a motion to dismiss a jury panel. (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*) ["[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required"].) We consider the court's exercise of its discretion with the knowledge that "discharging the entire venire is a remedy that should be reserved for the most serious

17

occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*Ibid.*) The "drastic remedy" of discharging the entire venire is not "appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks." (*Ibid.*) "Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments." (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466.) "In order to determine whether the trial court permitted the jury panel to be exposed to views so biased and prejudiced that [a reviewing court] must presume, absent more extensive admonition, the panel as a whole could not be fair and impartial, [the reviewing court] must look to the totality of the circumstances surrounding jury selection." (*Id.* at p. 1465.)

At the outset, we consider Smith's contention that this issue is reviewed de novo. Smith acknowledges that a trial court's decision not to dismiss a jury panel is reviewed for an abuse of discretion. However, he contends that the de novo standard of review applies because (1) this situation involves juror misconduct that constituted the receipt of extraneous information by the prospective jurors, thereby giving rise to a presumption of prejudice, and (2) whether that misconduct resulted in prejudice "is a mixed question of law and fact subject to an appellate court's independent determination." Smith relies on *People v. Nesler* (1997) 16 Cal.4th 561, 578–580, 582 (*Nesler*) in support of this contention.

Smith's contention is without merit. *Nesler* involved misconduct by a *seated* juror who told other jurors during sanity phase deliberations that she knew that the defendant used methamphetamine, left her children

18

unattended, and was not a good mother. (*Nesler, supra*, 16 Cal.4th at p. 571.) As the *Nesler* court explained, "When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias," and this "bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Id.* at pp. 578–579.) The defendant in *Nesler* did "not contend that the information [the juror] discussed during deliberations was so inherently prejudicial that by its very nature the information was likely to have influenced the vote of other jurors," but instead argued that the juror's "use of that information during deliberations demonstrates that it is substantially likely [the juror] herself was actually influenced by the extrajudicial information and, therefore, was actually biased." (*Id.* at p. 580.) In that circumstance, the reviewing court concluded that the juror's "repeated, improper use of the damaging information concerning defendant" showed "a substantial likelihood [that the juror] was influenced to defendant's detriment by the information she had received outside of court and, therefore, that she was actually biased." (*Id.* at p. 585, fn. omitted) The finding of actual bias on the part of a seated juror "pose[d] the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut," and gave rise to a presumption of prejudice that was unrebutted. (*Id.* at pp. 579, 589.) Based on the unrebutted presumption of prejudice, the court in *Nesler* concluded

19

that the defendant was entitled to a new trial on the issue of her sanity. (*Id.* at p. 590.)

Here, in contrast, the comments at issue were made by a *prospective* juror during voir dire. Voir dire is the time when the attorneys and the court are attempting to ascertain whether prospective jurors can be fair and impartial. Thus, " 'as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct "prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the . . . issue confronting it." ' " (*People v. Seaton* (2001) 26 Cal.4th 598, 636.)

We also reject the suggestion that Prospective Juror 73's comments introduced extrinsic evidence to the venire. Unlike what occurred in *Nesler*, Prospective Juror 73's comments did not purport to impart specific information about the defendant or witnesses in the case. Rather, Prospective Juror 73 made general statements about her state of mind with respect to people charged with crimes such as the ones charged in this case, as well as her general belief concerning the trustworthiness of children's statements, thereby exposing her personal bias with respect to both issues. Her comments cannot reasonably be understood to have provided extraneous information about Smith or about the child witnesses in this case. We therefore reject the argument that *Nesler* and its legal standards apply in this case.[7]

---

[7] In setting forth this argument, Smith's opening and reply briefs significantly mischaracterize what Prospective Juror 73 said. For example, Smith asserts that the other prospective jurors "heard from Prospective Juror [ ] 73 that, with her background in business, education, and the law, she

20

We also reject Smith's argument that the trial court abused its discretion in concluding that dismissal of the entire venire was not necessary. In *Medina*, a prospective juror indicated that she had heard other prospective jurors make statements suggesting that they believed the defendant was guilty, such as " 'even his own lawyers think he's guilty,' and 'they ought to have [*sic*] him and get it over with.' " (*Medina, supra*, 51 Cal.3d at p. 888.) One of the other prospective jurors confirmed that, while he and a few other prospective jurors were in the court elevator, he and some others had made "statements such as 'in frontier justice style,' the authorities should 'bring the guilty S.O.B. in, we'll give him a trial, and then hang him.' " (*Ibid.*) Another prospective juror stated that he had heard similar comments from other prospective jurors. (*Ibid.*) The defendant moved "to discharge the entire venire, on the ground that it had become tainted and that further inquiry would only aggravate the situation." (*Ibid.*) The trial court denied the motion without prejudice to a renewed motion following additional voir dire. However, defense counsel was concerned that asking additional questions of the prospective jurors might increase any potential bias against the defendant. (*Id.* at pp. 888–889.) None of the offending prospective jurors remained on the jury, and every "person selected for the jury affirmed his or her ability to be fair and impartial." (*Id.* at p. 889.)

---

knew that children don't lie and that we could dispense with the trial; appellant should just be taken out to an alley and shot." In fact, Prospective Juror 73 did not tie her comments to her work experience or to Smith. Rather, she said that she "think[s]" that children don't lie, that she would believe a child, and that, in her opinion, "[i]f someone is sexually assaulting a child," then that person "should be taken out in an alley and shot." Prospective Juror 73's remarks were clearly an expression of her personal views; she made no assertions of fact.

21

The Supreme Court concluded that these circumstances did not require discharging the entire venire. (*Medina, supra*, 51 Cal.3d at p. 889)  Noting that "discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant," the Supreme Court concluded that "[t]he present case falls short of that mark." (*Ibid.*)

This case also does not present a situation that would warrant the discharge of the entire jury panel.  Prospective Juror 73's comments did not involve an express discussion of Smith's guilt.  Rather, she commented that she, personally, was inclined to believe children.  Although Prospective Juror 73 did say, "If someone is sexually assaulting a child, in my opinion, they should be taken out in an alley and shot," she never indicated that she possessed particularized knowledge about the facts or evidence in this case.  Further, contrary to Smith's contention, Prospective Juror 73 never suggested in any manner that her work history provided her with "unique knowledge on the truth of the allegations."  Although Prospective Juror 73's husband was an attorney and she had worked as a legal secretary, she did not suggest that either she or her husband were involved with criminal law; her other work experience involved contracting in education.  In fact, the record reveals that the beliefs and opinions that Prospective Juror 73 expressed were likely based on her own experience as a child victim of sexual abuse, and not on her work history.  Prospective Juror 73 admitted that she could not be fair and impartial, in both her initial remarks and in response to the court's subsequent questioning, for the entire venire to hear.  Given Prospective Juror 73's admission of her own bias, the trial court reasonably concluded that the other prospective jurors would not simply believe or be

22

improperly influenced by Prospective Juror 73's remarks. We agree that there is no reasonable basis to conclude that Prospective Juror 73's comments concerning her general bias against defendants in child molestation cases would influence the other prospective jurors to be biased against Smith.

In addition, the trial court admonished the venire that a conviction may be based only on the evidence presented at trial. The court also admonished the prospective jurors that the voir dire process, in contrast to the presentation of evidence at trial, is used to "determine [prospective jurors'] ability to serve as fair and impartial jurors." Jurors are presumed to understand, correlate, and follow the court's instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852). Thus, those prospective jurors who ultimately became jurors are presumed to have understood that anything said by another prospective juror was irrelevant to the determination of Smith's guilt. Further, each seated juror affirmed that he or she could be fair and impartial. On this record, dismissal of the venire was not warranted.

Smith also argues that Prospective Juror 73 influenced at least Prospective Juror 48, and that the trial court failed to determine the full impact of Prospective Juror 73's comments by not inquiring further of the venire. However, defense counsel did inquire of all of the prospective jurors as to whether they agreed with Prospective Juror 73's comments. Only Prospective Juror 48 indicated any agreement. The court thereafter inquired further of Prospective Juror 48 to understand Prospective Juror 48's views. This inquiry of the venire was sufficient, and defense counsel did not request that the court engage in further questioning of the venire regarding Prospective Juror 73's comments. Smith's failure to ask the court to further question the prospective jurors forfeited this issue on appeal. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 735–736 [defendant's claim that a

23

prospective juror's statements tainted the entire venire was held not cognizable on appeal because defendant did not ask the court to dismiss the venire or even admonish the jury].) Further, we disagree with the proposition that Prospective Juror 48's statement that he agreed with Prospective Juror 73's comments demonstrates that he was affected by her remarks. Rather, he offered his own belief, based on his cultural history, that there should be severe punishment for guilty defendants. Even so, before being excused, Prospective Juror 48 affirmed that he would not prejudge the case, that he would follow the law, and that he could be fair and impartial. Thus, what occurred with respect to Prospective Juror 48 does not support Smith's contention that the court had any duty to inquire further of the venire regarding Prospective Juror 73's comments.

B. *The trial court's exclusion of GPS evidence and CWS referrals*

Smith contends that the trial court erred when it excluded GPS information from his work truck that he contends would have demonstrated where his vehicle was located on any particular day. Smith argues that this GPS evidence was probative as to J.T.'s credibility, because Smith had denied picking up J.T. from either school or the Boys and Girls Club during the time frame in which J.T. alleged he had committed some of the abuse.

Smith also contends that the trial court erred in excluding evidence of multiple CWS referrals that had been made about his children. According to Smith, the evidence regarding these referrals would have allowed him to impeach ex-wife N.B.'s preliminary hearing testimony. Specifically, Smith asserts that N.B. perjured herself when she testified at the preliminary hearing that she had not made most of the CWS referrals, and that the evidence of the CWS referrals would have impeached her and undermined her credibility. Smith maintains that N.B. had a motive to fabricate charges

of abuse against him, and suggests that N.B. was the source of false sexual abuse claims.

1. *Legal standards*

"Only relevant evidence is admissible at trial.  (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  A trial court has 'considerable discretion' in determining the relevance of evidence."  (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).)  "Although a trial court enjoys broad discretion in determining the relevance of evidence [citation], it lacks discretion to admit evidence that is irrelevant [citations] or excluded under constitutional or statutory law [citation].  The proponent of proffered testimony has the burden of establishing its relevance . . . .  [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence." (*People v. Morrison* (2004) 34 Cal.4th 698, 724.)

The trial court also has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines that the probative value of the evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)

An appellate court reviews a trial court's rulings regarding relevance and admissibility under Evidence Code section 352 for an abuse of discretion. (*Merriman,* supra, 60 Cal.4th at p. 74.)  A proper exercise of discretion is " 'neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the

spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)[8]

### 2. *Evidence of the GPS monitoring records from Smith's work truck*

#### a. *Additional background*

Prior to trial, the prosecution moved to exclude evidence of the GPS records from the truck that Smith used when he worked for Cosco Fire Protection, on the ground that the records were "vague". The court held an Evidence Code section 402 hearing regarding the GPS records.

---

[8] Although Smith acknowledges that evidentiary rulings are typically reviewed for an abuse of discretion, he nevertheless contends that his evidentiary challenges are entitled to de novo review because, he maintains, the alleged errors implicate his constitutional right to present a defense. Smith cites *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, footnote 7 (*Albarran*) and *People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*) to support his contention that he is entitled to de novo review of the trial court's rulings with respect to the GPS and CWS referral evidence. As we will explain further, with respect to one of the alleged errors, we conclude that there was no error, and with respect to the other, we conclude that any erroneous exclusion did not amount to a deprivation of Smith's constitutional right to present a full defense. We therefore reject Smith's suggestion that the challenged evidentiary rulings should be reviewed de novo. Smith's reliance on *Albarran* and *Seijas* does not alter our conclusion. Neither *Albarran* nor *Seijas* discussed the appropriate standard of review for a challenge contending that the trial court erroneously excluded evidence. *Albarran* addressed the appropriate standard for a trial court's denial of a motion for new trial, where "the authorities are less clear regarding the standard of review" than with respect to the granting of a new trial. (*Albarran,* at p. 224, fn. 7.) Of note, the *Albarran* court expressly stated that, "[T]he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court." (*Id.* at pp. 224–225.) *Seijas* addressed the standard of review with respect to a trial court's ruling on a witness's assertion of a privilege, not an evidentiary ruling. (*Seijas, supra,* 36 Cal.4th at p. 304.)

At the evidentiary hearing, T.R. testified that he was the operations manager at Cosco Fire Protection (Cosco) and that he started working there in March 2017. According to T.R., Smith used a specific work truck while he worked for Cosco. Cosco utilized a "G.P.S. monitoring system" that was installed on the company vehicles. The company that provided the GPS monitoring system maintained a record of the GPS information, which was linked to a record of date, time, and location information for the starting and ending point of a trip. The starting point for a trip would be the moment a vehicle was turned on, and the ending point would be the moment the vehicle is turned off. The GPS monitoring company did not record GPS information while a trip was in progress. As a result, if Smith had been driving his company vehicle and made a stop without turning off the engine, the GPS monitoring company's system would not have a record of the date, time, or location of that stop.

T.R. explained that only he and other "senior management" employees could access the GPS monitoring company's records for Cosco's vehicles. These Cosco employees downloaded the records from the GPS monitoring company's website.

Defense counsel argued that T.R. established the GPS monitoring records as proper business records, and that the records were admissible to show where Smith's truck began a trip and where it ended a trip between 2015 and the date of Smith's arrest in 2018. When questioned by the court as to whether the records could demonstrate what Smith did before he arrived home, the defense argued that they "do determine that."

The prosecutor opposed admission of the GPS records, arguing that the records were not relevant, at least in part because the records covered time periods during which J.T. did not allege that abuse occurred, and because

27

there were at least "400 entries" all demonstrating that Smith arrived home at different times.

The trial court ultimately decided to exclude the records, explaining, "They are too vague. We don't know the dates. It's confusing. What? Are you going to offer the whole package there and say, 'Here's all the times he got home from work' when we don't know what he did or when he did it or how he did it. It's too vague. It will not be allowed."[9]

    b. *Analysis*

Smith asserts that the trial court erred in excluding the GPS monitoring records from his Cosco work truck. According to Smith, the GPS evidence was probative because the records "showed where and when appellant was located for each day during the period of time in question," and could therefore "show who was telling the truth" about whether Smith had, in fact, picked up J.T. after her school day ended, as she testified

" 'When the relevance of proffered evidence depends on the existence of a disputed material fact or facts, the proponent of that evidence bears the burden of establishing all preliminary facts pertinent to the question of relevance. [Citations.] The disputed evidence is inadmissible unless the court finds evidence sufficient to sustain a finding that those pertinent preliminary facts exist.' " (*People v. Melendez* (2016) 2 Cal.5th 1, 23, citing Evid. Code, § 403.) In this situation, Smith failed to establish the preliminary fact that the records actually showed that he did not pick up J.T. from school or that he was not home with her in the afternoons or early

_____

[9] When asked by defense counsel whether the court would allow "a limited as to scope where the dates are — if [J.T.] testifies to [specific time frames]," the court indicated that it "would reconsider as to [a specific date], but generally speaking, no." Defense counsel made no further proffer as to a specific date or set of dates.

evenings, before J.T.'s mother returned home.[10] Given that the Cosco witness testified that the GPS monitoring system did not record information when the truck remained on, it was possible that Smith left work at different times each day and stopped to pick up J.T. from school or the Boys and Girls Club without there being any record of that event. Further, the trial court confirmed with the prosecutor that the records did not show that Smith arrived home after 5:00 p.m. every day, and defense counsel did not object or suggest otherwise. Instead, Smith provided a voluminous set of records, covering a multi-year period, that demonstrated that he arrived home at different times each day. Without establishing the preliminary fact that Smith did not pick up J.T. after school or that he was not home alone with her in the afternoon or early evening, the records were not relevant to a material issue in dispute. Nor could the records be used to "test the credibility of [J.T.]," because Smith failed to establish that the records actually contradicted J.T.'s testimony. Given that A.S., J.T.'s mother, testified that A.S. would not return home until "[a]t least [6:00]" in the evening, unless the GPS records could show that Smith consistently arrived home later than 6:00 p.m.—which Smith did not claim the records could show—the records could not have disproved or even undermined J.T.'s testimony that Smith molested her at home, after she returned from school or an after school program and before her mother arrived home in the evening. As a result, the GPS evidence had no real probative value. The trial court therefore properly excluded the GPS monitoring records from Smith's work truck.

---

10     Smith failed to identify any specific record or records that showed that he could not have picked up J.T. from school or been home alone with J.T. during the relevant time period.

### 3. *Evidence of the CWS referrals*

#### a. *Additional background*

The prosecution also sought to exclude evidence of CWS referrals pertaining to the children Smith shared with N.B., that were unrelated to the charges in this case. The prosecution noted during defense counsel's questioning of N.B. at the preliminary hearing that defense counsel had presumed that N.B. had made all of the referrals relating to S.S. even though N.B. testified that she had not.[11] According to the prosecutor, many of the referrals had come from school counselors or teachers. The prosecutor explained that she had provided the defense with information about interviews of N.B. during which N.B. had "itemized what referrals [to CWS] . . . she believed she made . . . ." The prosecutor further proffered that N.B. had stated that she had called CWS on only two occasions, and that both calls pertained to her concern about Smith showering with S.S.

Defense counsel argued that the numerous referrals for CWS investigations were relevant because they showed that prior allegations of physical or sexual abuse of S.S. and her two siblings had been determined to be unfounded or inconclusive. Defense counsel argued that the evidence was also relevant because it showed how many times S.S. had denied being abused and how many times N.B. had made prior accusations against Smith. However, defense counsel did not make an offer of proof of any evidence that would demonstrate that N.B. had, in fact, made more than two calls to CWS.

---

11    At the preliminary hearing, N.B. admitted that she had made at least one call to CWS to complain about Smith taking showers with S.S. In response to questions posed to her about referrals made on other dates, she denied being the source of those other calls to CWS.

The trial court excluded the evidence, noting "we are not trying all those cases [i.e., the sexual abuse referrals to CWS]."[12]

       b. *Analysis*

Smith contends that "[N.B.]'s testimony at the preliminary examination was perjured," and that because of this, "her examination on the [CWS] referrals at trial . . . would have resulted in her impeachment, with an obvious effect on her credibility." On this basis, Smith asserts that evidence of the CWS referrals was relevant and probative, and that the trial court erred in excluding it.[13]

Smith cites to no portion of the record to support his contention that N.B. perjured herself at the preliminary hearing. He refers to the fact that the prosecutor noted, at trial, that "we obviously both have a big binder of child welfare records," and then simply asserts, without citation to the record, that "[d]efense counsel's offer of proof was that [N.B.] had made numerous referrals to CWS of both physical and sexual abuse involving all three of appellant's children, and all were found to be unfounded or inconclusive." The fact that there was a "big binder of child welfare records" does not establish that N.B. was the person who made all or even a large number of the referrals, and our review of the record does not support the assertion that defense counsel made an offer of *proof* as to any evidence that would support

---

[12]    There was a single charged count for which S.S. was the identified victim.

[13]    Smith does not specify in his argument on appeal whether he is contending that evidence of all of the CWS referrals should have been admitted or whether only some portion of those referrals should have been admitted. At trial, defense counsel appeared to be seeking the admission of only those referrals related to sexual abuse. On appeal, Smith does not so limit his argument, but instead, discusses referrals regarding both "physical and sexual abuse."

such a claim. Although the attorneys discussed the existence of many confidential records demonstrating that one or more individuals had called CWS to report various concerns about S.S. or her siblings, there was nothing more than speculation offered that the CWS records would show that N.B. made any calls beyond the two that she conceded making when she was interviewed. This was not a sufficient offer of proof. (See *People v. Eid* (1994) 31 Cal.App.4th 114, 127 [an offer of proof "based on nothing more than optimistic expectation" of what witness might admit was insufficient].)

The fact that N.B. acknowledged making one call during her testimony at the preliminary hearing, while the prosecutor proffered that N.B. had reviewed the referrals and identified two calls that she had made, does not suggest that N.B. perjured herself at the preliminary hearing. A review of N.B.'s preliminary hearing testimony demonstrates that N.B. was asked whether she had made specific referrals on certain dates, and it was in this context that she identified only one of the calls as being one that she had made. She did, however, readily acknowledge that she had called CWS about her concern that S.S. had told N.B. that she felt uncomfortable being required to take showers with her father. Whether N.B. made one CWS referral about this concern or two is not a material distinction and could have simply been the result of the manner in which N.B. was examined during the preliminary hearing. There is no indication that N.B. lied under oath at the preliminary hearing, and the record does not support defense counsel's suggestion that N.B. made repeated CWS calls over multiple years to report concerns about sexual abuse by Smith and then perjured herself during the preliminary hearing by testifying that she had made only one such call.

In his reply brief, Smith appears to seize on what is clearly a typographical error, albeit an unfortunate one, to suggest that the People

conceded that the "the offer of proof established that Nicole perjured herself at the preliminary examination." The People state the following in their brief:

> " 'As with the GPS records, appellant did not carry his burden as the proponent of the evidence—he did provide an offer of proof showing the numerous CWS referrals came from N.B. to qualify them as relevant impeachment evidence against her. Absent that preliminary fact, the CWS referrals were not relevant and properly excluded.' "

It is clear from the context of the remainder of the People's argument that the People did not intend to say that Smith "*did* provide an offer of proof showing the numerous CWS referrals came from N.B." (italics added), but instead, that Smith "did [*not*] provide an offer of proof showing the numerous CWS referrals came from N.B." We therefore reject Smith's suggestion that the People conceded that the offer of proof with respect to the CWS records was sufficient. It is clear that the People's position is that Smith's proffer was insufficient, and we agree. We therefore reject the premises of Smith's argument—i.e., that N.B. perjured herself at the preliminary hearing and that the CWS records were relevant to undermine her credibility based on this purported perjured testimony.

Even if Smith had been able to demonstrate that the trial court erred in excluding the CWS referral records, we would nevertheless conclude that the error was harmless. First, we disagree with Smith that such error would amount to a violation of Smith's constitutional right to present a complete defense or to a fair trial. "In general, the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.] [¶] . . . [¶] Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense

33

evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)] . . . ." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999; see *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 ["Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson*"].) "If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Thus, even assuming that the trial court erred in excluding the CWS evidence, the excluded evidence would, at most, have impeached N.B.'s credibility on a subsidiary point, and possibly demonstrated her bias against Smith. The exclusion of this evidence did not preclude Smith from presenting his defense; N.B.'s credibility was not central to the People's case. N.B. was not the one accusing Smith of abuse—there were two child witnesses who provided consistent statements about the abuse over time and also provided narratives about their experiences that were consistent with each other. In addition, Smith presented testimony challenging N.B.'s credibility and her possible bias in not wanting to share custody of their children with him. Thus, he was not entirely prevented from presenting evidence as to N.B.'s bias. We therefore apply the *Watson* standard of prejudice review to this assumed error. (See *People v. Harris* (2005) 37 Cal.4th 310, 336 [application of ordinary rules of evidence does not implicate rights under the federal

Constitution, and allegations of error are reviewed under the reasonable probability standard set forth in *Watson*].)

Under the *Watson* standard, if a trial court erroneously excludes evidence, the defendant must show on appeal that it is reasonably probable that he would have received a more favorable result if that evidence had been admitted. (*Watson, supra*, 46 Cal.2d at p. 836.) We cannot conclude that Smith would have received a more favorable result if the evidence of the CWS referrals had been admitted.[14] First, to the extent that Smith is contending that the exclusion of the evidence of the CWS referrals was prejudicial with respect to all of the charges against him, the vast majority of the charges pertained to J.T., and only a single charge involved S.S. While Smith argued that N.B. was, in effect, responsible for S.S.'s allegation, any undermining of N.B.'s credibility would not have had any impact on the bulk of the charges. Further, both minor victims provided specific, detailed and credible testimony about the abuse. Not only was it demonstrated that the two victims' stories about what had occurred were consistent over time, but their stories were consistent with each other, and other witnesses corroborated these minor victims' testimony. Smith therefore cannot demonstrate that any presumed error in the exclusion of the CWS referral records was prejudicial.

C. *The trial court did not err in admitting expert testimony on CSAAS*

Smith contends that the trial court erred in admitting expert testimony on CSAAS. Smith argues that the CSAAS expert testimony should have been

---

[14] This presumes that the CWS referrals would have demonstrated, in fact, that N.B. had lied when she said that she had made no more than two of the many calls made to CWS regarding the children of Smith and N.B. Again, there has been no showing that the CWS referrals would have demonstrated this.

excluded because (1) CSAAS is, essentially, irrelevant because the public has become aware of the child abuse concepts discussed in CSAAS; (2) CSAAS is unreliable scientific evidence that has not been evaluated under the "*Kelly/Frye* test"[15] and is controversial; (3) CSAAS's "non-existent probative value" was substantially outweighed by "substantial danger of jury confusion and unfair prejudice"; and (4) the admission of this evidence violated his rights to a fair trial and due process.

1. *Additional background*

Smith moved to exclude expert testimony on CSAAS, arguing that the evidence was unreliable, that it should be excluded under Evidence Code section 352, and that the prosecution's expert was not sufficiently qualified. The prosecutor argued that the expert testimony was admissible, and indicated that the expert would be asked to testify only generally about child abuse victims, without making reference to CSAAS explicitly or to the facts of this case.

The trial court held an Evidence Code section 402 hearing, at which the prosecution's expert testified that she was a clinical psychologist who had been in practice since 1996. The expert testified about, and was cross-examined on, her qualifications, including the source materials and studies that she relied on, and her history of testifying as an expert. The expert explained that CSAAS "is a model that was first developed by Roland . . . Summit in the late 70's, published in 1983. The purpose of the model was to help explain the behavior of children who have been sexually abused." The

---

15    See *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. Although the rule was "[f]ormerly known as the *Kelly-Frye* rule, . . . the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 491, fn.8.)

expert noted that although her testimony was based in part on the model of CSAAS, her testimony was "much more based on the current research and [her] experience and training."

The trial court reminded the expert that she would not be allowed to opine as to "whether the incidents in this case happened or not," and proceeded to rule that the CSAAS evidence was "absolutely informative" and was admissible.

2. *Analysis*

Smith argues that the CSAAS testimony should have been excluded because CSAAS is, essentially, irrelevant because the public has become aware of the child abuse concepts discussed in CSAAS, because this type of evidence constitutes controversial scientific evidence and was not properly evaluated under applicable standards, and because this evidence was likely to prejudicially confuse the jury. The appellate court in *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), recently addressed arguments similar to those that Smith raises, and rejected them. The defendant in *Munch* argued that CSAAS evidence "is irrelevant and 'the public no longer holds the presumed misconceptions this testimony purports to address.' " (*Id.* at p. 468.) The *Munch* court disagreed with this contention, relying on the Supreme Court's opinion in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*).

In *McAlpin*, the Supreme Court concluded that CSAAS evidence "is admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at p. 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse,

and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)  However, CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused" (*id.* at p. 1300), and "[t]he expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871).

The *Munch* court reaffirmed that *McAlpin* remains valid and binding with respect to the admissibility of CSAAS evidence.  (*Munch, supra*, 52 Cal.App.5th p. 468, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [decisions of Supreme Court are binding on other state courts of California].)  As the *Munch* court explained, since the Supreme Court's opinion in *McAlpin* in 1991, CSAAS evidence has been admitted by courts in this state.  (*Munch,* at p. 468.)

Despite the continued validity of *McAlpin,* Smith, like the defendant in *Munch*, relies on several out-of-state cases to argue that CSAAS evidence has been rejected as unnecessary to disabuse jurors with respect to misconceptions about the conduct of abused children.  As the *Munch* court explained, however, the fact "[t]hat other jurisdictions may disagree with [*McAlpin*] does not change [*McAlpin*'s] impact on California cases." (*Munch, supra*, 52 Cal.App.5th at p. 468.)  The *Munch* court also explained why the out-of-state authorities relied on by the defendant in that case for the proposition that other jurisdictions no longer admit CSAAS evidence because of its purported deficiencies, including three of those cited by Smith in this case, were not persuasive on their merits.  (*Id.* at p. 469.)  For example, the *Munch* court noted that *Commonwealth v. Dunkle* (Penn. 1992) 602 A.2d 830, on which Smith relies, was superseded after "the Pennsylvania Legislature passed a law 'providing for the admissibility of this type of expert

38

testimony.' " (*Munch,* at p. 469.)  Similarly, *State v. Davis* (Ohio.Ct.App. 1989) 581 N.E.2d 604, also relied on by Smith, was overruled by the Ohio Supreme Court.  (*Munch,* at p. 469, citing *State v. Stowers* (Ohio 1998) 690 N.E.2d 881, 883.)  Finally, as *Munch* explained, *State v. Schimpf* (Tenn.Crim.App. 1989) 782 S.W.2d 186 is consistent with *McAlpin,* because that court concluded that the child sexual abuse expert testimony was inadmissible only because " 'there the expert examined the victim and testified that the child 'had, in fact, been sexually abused.' " (*Munch,* at p. 469, citing *State v. Schimpf, supra,* 782 S.W.2d at p. 193.)  We agree with the *Munch* court that these out-of-state authorities do not support Smith's contention that CSAAS is outdated and that expert testimony concerning CSAAS is no longer relevant in child abuse cases.  (See *Munch*, at p. 469.)

We also agree with the *Munch* court that CSAAS evidence need not be subjected to a *Kelly* analysis because it is not "new experimental scientific evidence ' "not previously accepted in court." ' " (*Munch, supra,* 52 Cal.App.5th at p. 472, italics omitted.)  CSAAS evidence is " 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' " (*Id.* at p. 473.) " 'The *Kelly/Frye* rule does not apply to this type of evidence.' " (*Munch,* at p. 473.)  Expert testimony regarding CSAAS "meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly*].' " (*Munch,* at p. 473.)  We see no reason to differ with the *Munch* court's conclusion that CSAAS evidence does not require application of the *Kelly* analysis.

Finally, we reject Smith's contention that the CSAAS evidence was far more prejudicial than probative under Evidence Code section 352.  " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with

"damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).) It involves evidence that tends to "evoke an emotional bias against the defendant . . . [and] which has very little effect on the issues." (*Ibid.*)

We see no abuse of discretion in the trial court's determination that the probative value of the CSAAS evidence was not outweighed by a substantial danger of undue prejudice. First, Smith argues that because CSAAS evidence cannot be used to prove that an alleged victim was in fact abused, and because CSAAS evidence is not needed to "bolster the victims' credibility because there [are] no longer generally held misconceptions about how a child victim of sexual abuse should act," CSAAS evidence is not sufficiently probative in abuse cases like this. However, as we have explained, contrary to Smith's assertion, "CSAAS evidence [remains] relevant to advise jurors that [the victims'] normally self-impeaching behavior is not unusual for sexually abused children." (*Munch, supra*, 52 Cal.App.5th at p. 475, citing *McAlpin, supra*, 53 Cal.3d at p. 1300.) In this case, neither J.T. nor S.S. immediately disclosed the abuse, or the full extent of the abuse. In addition, J.T. did not tell her mother that she would refuse to live with Smith again, even after she made an initial disclosure to her mother. The expert's testimony was probative of issues surrounding the credibility of the victims, given that some of their behaviors could appear to a lay person to be inconsistent with how a "typical" victim might act. (See, e.g., *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 [CSAAS evidence properly admitted to explain why victim "did not immediately inform anyone of her molestation and why she slowly revealed the details of the molestation"].)

Further, the CSAAS evidence was not unduly prejudicial. " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*Karis, supra,* 46 Cal.3d at p. 638.) Rather, as noted,

prejudice in the context of Evidence Code section 352 refers to evidence that tends to "evoke an emotional bias against the defendant . . . which has very little effect on the issues." (*Karis,* at p. 638.) The expert's testimony cannot be viewed as evoking an emotional bias against Smith. The expert testified only generally about misconceptions regarding how children react to molestation. She did not detail specific abuse, and she testified that she was not aware of the facts of this case and was discussing, generally, the studies and research that she had read.

Finally, we reject Smith's contention that the admission of the expert's testimony regarding CSAAS violated his fair trial and due process rights. Again, Smith's contention in this respect rests on his assertion that the CSAAS evidence is not relevant. We have rejected this assertion and concluded that the CSAAS evidence was relevant. Thus, the trial court reasonably determined that the expert testimony concerning CSAAS would be admitted. Because we have concluded that there was no evidentiary error with respect to the trial court's decision to admit the CSAAS evidence, the admission of this evidence did not violate Smith's constitutional fair trial or due process rights. (See *People v. Cage* (2015) 62 Cal.4th 256, 284 ["because the trial court did not abuse its discretion in admitting [the challenged evidence], there was no violation of defendant's constitutional rights" arising from the admission of the evidence].)

D. *The trial court did not err with respect to its instruction regarding the jury's use of the CSAAS evidence*

Smith contends that the trial court prejudicially erred when it instructed the jury with CALCRIM No. 1193, which is the pattern instruction regarding CSAAS evidence. According to Smith, the instruction improperly permitted the jury to use the CSAAS evidence as direct evidence of his guilt.

41

1. *Additional background*

The prosecutor requested that the trial court instruct the jury with CALCRIM No. 1193. The standard CALCRIM No. 1193 instruction provides:

> "You have heard testimony from _____ <insert name of expert> regarding child sexual abuse accommodation syndrome.
>
> "_____'s <insert name of expert> testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged].
>
> "You may consider this evidence only in deciding whether or not _____'s <insert name of alleged victim of abuse> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The trial court indicated that it would give the instruction, and the prosecutor requested that the instruction be modified to exclude the reference to child sexual abuse accommodation syndrome by name because she had not elicited the name of the syndrome during her examination of the expert. Defense counsel interjected, noting that he had elicited the name of the syndrome about which the expert was testifying during cross-examination. Defense counsel seemed to be asking that the instruction be given as stated in the standard instruction.[16] The court agreed with defense counsel, stating, "It's in."

The trial court instructed the jury as follows, consistent with the standard CALCRIM No. 1193 instruction:

---

[16] The discussion on this point was ambiguous, but defense counsel ultimately said, "I think it should come in." Based on the reported conversation, the "it" appears to refer to CALCRIM No. 1193, without modification to exclude its reference to CSAAS by name.

42

"You have heard testimony from Jayme Jones regarding child sexual abuse accommodation syndrome.

"Jayme Jones's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not the conduct of [J.T.] and/or [S.S.] was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

### 2. *Analysis*

As an initial matter, the People point out that Smith has forfeited his claim because he did not object to the instruction in the trial court, and instead, agreed to the court giving it. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579, citing *People v. Bolin* (1998) 18 Cal.4th 297, 327.) In order to obtain review of the claim on its merits, Smith offers that this claim should be considered preserved because it affected his substantial rights, in that the instruction "lessened the prosecution's burden of proving guilt beyond a reasonable doubt" and thereby deprived him of his right to due process. Smith also argues that his attorney provided ineffective assistance in not objecting to this instruction. Given Smith's claim of ineffective assistance of counsel, we elect to address his contention on its merits, despite his forfeiture of the claim. (See *People v. William*s (1998) 61 Cal.App.4th 649, 657 [addressing the merits of a claim, despite its possible forfeiture, because defendant asserted ineffective assistance of counsel].)

We review de novo the question whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider " 'whether the trial court "fully and fairly instructed on the applicable law." [Citation.] "In determining whether error has been committed in giving or

43

not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible [of] such interpretation.' [Citation.]" (*People v. Wetle* (2019) 43 Cal.App.5th 375, 381–382.)

Smith argues that the trial court "erred in instructing [the jury] pursuant to CALCRIM No. 1193" because the standard instruction "not only does an inadequate job of explaining these principles, but effectively instructs the jury that they may take such testimony as evidence of the defendant's guilt." He asserts that this error "lessened the prosecution's burden of proof in violation of appellant's Fifth, Sixth and Fourteenth Amendment rights and was prejudicial."

We disagree with Smith's contention that the standard instruction on CSAAS instructed jurors that they could use CSAAS evidence as evidence that Smith "committed the crimes charged against him." In response to an essentially identical argument, the *Munch* court reaffirmed the validity of CALCRIM No. 1193 and also concluded that the instruction does not reduce the prosecution's burden of proof. (*Munch, supra,* 52 Cal.App.5th at p. 474.) The *Munch* court relied on *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 to reject the defendant's argument that CALCRIM No. 1193 " 'effectively instruct[ed] the jury that they may take [the expert's] testimony as evidence of the defendant's guilt.' " (*Munch,* at p. 474.) " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does

44

not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.* Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Munch,* at p. 474, quoting *Gonzales,* at p. 504.) We agree with *Munch* and *Gonzales.* Contrary to Smith's claim, CALCRIM No. 1193 does not indicate to the jury that it may consider the expert's testimony as evidence that Smith committed the crimes charged. To the contrary, the instruction informs the jury that CSAAS evidence is *not* evidence that a defendant committed any of the crimes charged, and instead, that such evidence may be used only in considering whether the conduct of the victims was "not inconsistent" with the conduct of someone who has been molested, and thereby in evaluating the believability of the victim's testimony.

In addition, the trial court instructed with CALCRIM No. 303, which informed the jury that "certain evidence was admitted for a limited purpose," and that the jury was to "consider that evidence only for that purpose and no other." We presume that jurors understand and follow instructions. (*People v. Erskine* (2019) 7 Cal.5th 279, 303.) Given this, we conclude that there is no reasonable likelihood that the jury misapplied CALCRIM No. 1193 and used the CSAAS evidence as evidence of Smith's guilt.

We also reject Smith's attempt to analogize CSAAS evidence to the "case specific hearsay" that was determined to be inadmissible in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Sanchez* does not apply in this

45

case. An expert testifying about CSAAS is not asked to opine, even as a hypothetical, as to whether an offense like the one the defendant allegedly committed actually occurred. Further, CALCRIM No. 1193 specifically instructs a jury that the expert's testimony "about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him." Finally, unlike the case-specific hearsay that formed the basis for the gang expert's opinion in *Sanchez*, the foundational information relied on by the expert in this case was culled from academic research and findings in a therapeutic context, which is precisely the kind of "general background information" that provides a valid foundation for expert testimony. (See *Sanchez,* at p. 685 ["[O]ur decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise"].)

E. *There are no cumulative errors*

Smith contends that the errors about which he complains were cumulatively prejudicial and deprived him of a fair trial. We disagree.

"Under the 'cumulative error' doctrine, [an appellate court] reverse[s] the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. [Citations.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

As we have discussed, there is no combination of prejudicial errors to cumulate. Accordingly, Smith cannot demonstrate that there is any cumulative effect of alleged errors that resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be

46

used to support a cumulative error claim because we have already found there was no error to cumulate"].)

F.  *Smith forfeited his challenge to the trial court's imposition of assessments, fines and fees without consideration of his ability to pay, and he cannot demonstrate ineffective assistance of counsel with respect to his attorney's failure to request an ability to pay hearing*

Smith contends that the trial court erred in imposing various fines and fees without first determining, under the authority announced in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), that Smith had the ability to pay those fines and fees.[17]

1.  *Additional background*

At the sentencing hearing, which took place on October 4, 2019, the court imposed a $10,000 restitution fine under Penal Code section 1202.4, subdivision (b), suspended a $10,000 restitution fine under Penal Code section 1202.45, and imposed fees of $520 under Penal Code section 1465.8, subdivision (a)(1), $154 under Government Code section 29550, and $390 per Government Code section 70373.  In addition, the court imposed a fine of $300 under Penal Code section 290.3.  The court made no determination that Smith had the ability to pay these fines and fees, and Smith did not request that such a finding be made.

At the time of sentencing, Smith was 38 years old.  Prior to being arrested, he had been living in a rental house with his wife, stepdaughter, and his children.  Smith had been paying N.B. $1,250 a month in child support.  He had been working since he was 18 years old, and, at the time of

---

[17]  The Supreme Court is currently considering whether a trial court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments, and if so, which party bears the applicable burden of proof.  (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

his arrest, he had been working for Cosco for eight years and was making $6,500 per month. Smith owned two vehicles, and had total debt of around $50,000, which included what he owed on the vehicles and credit cards. Smith had no physical or mental infirmities.

2. *This contention has been forfeited*

Preliminarily, the People argue that Smith has forfeited his claim of error because his sentencing hearing took place on October 4, 2019, many months after the opinion in *Dueñas* was issued in January 2019.

We agree that Smith has forfeited his contention under *Dueñas*. In general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 853–854; see also *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.) This is particularly so in this case, where the sentencing occurred well after the *Dueñas* court declared a constitutional right to a court determination of the defendant's ability to pay before imposing statutorily mandated fines and assessments. In addition, because the $10,000 restitution fine imposed by the trial court exceeded the $300 statutory minimum, Smith had the opportunity to object and argue that he was unable to pay it, but he did not do so, notwithstanding established statutory authorization for raising such a challenge (Pen. Code, § 1202.4, subd. (d)).[18] By failing to raise the issue of his inability to pay the $10,000 restitution fine, Smith forfeited any claim that the court violated his

---

[18]  Penal Code section 1202.4, subdivision (d) provides that the court "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay," in setting a fine in excess of $300, which is the minimum fine amount set in subdivision (b)(1) of the provision.

constitutional rights by imposing that fine, as well as the other fines and fees imposed by the court, without considering his ability to pay.  (See *People v. Miracle* (2018) 6 Cal.5th 318, 356 [defendant forfeited challenge to restitution fine which exceeded statutory minimum by failing to object at sentencing]; see also *People v. Jenkins* (2019) 40 Cal.App.5th 30, 40–41, review granted Nov. 26, 2019, S258729 [defendant had a statutory right to object to imposing of $9,700 of $10,000, and his failure to do so resulted in forfeiture of his claim under *Dueñas* that all of the assessments and fees imposed without an ability to pay hearing violated his right to due process].)

Because Smith failed to raise the question of his ability to pay the imposed fines and fees in the trial court, he is precluded from raising an appellate challenge to the trial court's imposition of fines, fees or assessments without an ability to pay hearing.

### 3. *Ineffective assistance*

Smith alternatively contends that if this court concludes that he has forfeited his claim that the trial court erred in imposing the challenged fines and fees without determining his ability to pay them, then his trial counsel rendered ineffective assistance in failing to assert an objection to this ground.

" 'The law governing [an ineffective assistance of counsel] claim is settled.  "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions.  [Citations.]  'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " [Citations.]  It is defendant's burden to demonstrate the inadequacy of trial counsel.  [Citation.]  We have summarized defendant's burden as follows:  " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an

49

objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, [a defendant] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 875–876 (*Vines*), partially overruled on a different ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' [Citation.] If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' " (*Vines, supra*, 51 Cal.4th at p. 876.)

Smith has not met his burden to demonstrate either that his trial counsel's performance was deficient, or that there is a reasonable probability that, but for counsel's failure to object to the court's failure to conduct an ability to pay inquiry, the result would have been different. As to the first

50

point, the record does not reveal why defense counsel failed to request an ability to pay determination, and counsel has apparently not been asked to provide an explanation. As a result, " ' " 'unless there simply could be no satisfactory explanation' " ' " for counsel's failure to act (*Vines, supra,* 51 Cal.4th at p. 876), we must reject Smith's ineffective assistance of counsel claim. In this case, counsel could have reasonably concluded that, given this record, an ability to pay hearing would not have altered the court's decision-making with respect to the fines and fees imposed. Specifically, the record demonstrates that Smith has an ability to pay the fines and fees imposed, based on his past income-earning capacity and his prior financial means, as well as his ability to earn prison wages while serving his sentence. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages' "].)

The fact that there is evidence that Smith does have an ability to pay the imposed fines and fees also prevents Smith from being able to make the requisite showing of prejudice for purposes of an ineffective assistance of counsel claim. In essence, because there is evidence that Smith has an ability to pay the fines and fees, there is no reasonable probability that, but for counsel's failure to request an ability to pay hearing, the trial court would have imposed fines and fees in a lesser amount. (See *People v. Johnson* (2019) 35 Cal.App.5th 134 [any error in imposing fines and fees without an ability to pay hearing was harmless because record showed that defendant had some financial means and past income-earning capacity, as well as an

ability to earn prison wages]; see also *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035–1036 [same].)

G. *Any portion of the criminal justice administration fee imposed that remained unpaid as of July 1, 2021 must be vacated*

As of July 1, 2021, the statutory provision pursuant to which the court ordered Smith to pay a $154 criminal justice administration fee was repealed (See former Gov. Code, § 29550), and newly-enacted Government Code section 6111 became effective.[19]  Government Code section 6111 provides:

> "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to [(Government Code]) Section 27712, subdivision (c) or (f) of [(Government Code]) Section 29550, and [(Government Code]) Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.

> "(b) This section shall become operative on July 1, 2021."

Because this change in the law became effective after the parties had submitted their briefs in this matter, we requested that the parties provide supplemental briefing on the question of the effect of the repeal of former Government Code section 29550 and the enactment of Government Code section 6111 on this pending appeal.  In response to our supplemental briefing request, Smith argues that Assembly Bill 1869's repeal of former Government Code section 29550 and enactment of Government Code section 6111 "is an 'ameliorative change' [citation], and under the [*Estrada, supra,* 63 Cal.2d 740] rule, this provision will apply retroactively to all cases not yet final on its operative date."  He further argues that "[Assembly Bill] 1869

---

19    These changes were enacted when the Governor's signed Assembly Bill No. 1869 into law.  Effective July 1, 2021, Assembly Bill No. 1869 eliminates many fines, fees, and assessments that courts have imposed under a variety of statutes. (Added Stats. 2020, ch. 92 (2019–2020 Reg. Sess.) §§ 2, 11, 62 (Assembly Bill 1869).)

indicates, on its face, that its provisions apply to all cases," and because of this, "and because appellant's case is not final, the fee should be stricken." Smith requests that this court "order the abstract of judgment amended to strike the fee and direct the trial court to vacate the portion of the judgment ordering collection of any unpaid debt related to that fee." The People argue that this court need not do anything in response to the change in the law because "appellant is entitled to automatic relief for his criminal justice administration fee starting July 1, 2021." The People assert that "because appellant will obtain . . . relief [from enforcement and collection of the fee] automatically—i.e., without any need for further briefing or motion practice in any court—his argument that this court should 'strike the fee and direct the trial court to vacate the portion of the judgment' [citation] is unnecessary."

As the parties' arguments reflect, the issue raised by the enactment of Assembly Bill 1869 requires that we assess whether, and to what extent, the Legislature intended the new statutory scheme to apply to individuals whose nonfinal judgments include the imposition of fees that were repealed after sentence was imposed. Because these questions involve interpretation of a legislative enactment involving the repeal of one relevant provision (former Gov. Code, § 29550.1) as well as the addition of a new provision (Gov. Code, § 6111), we rely on certain general rules governing statutory interpretation. A reviewing court's construction of a statute is " 'guided by the overarching principle that [its] task " 'is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent.' " ' " (*In re R.V.* (2015) 61 Cal.4th 181, 192.) First among the principles of statutory interpretation is honoring " 'the language of the statute' " as " 'construed in the context of the statute as a whole and the

overall statutory scheme.' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901.)  If the language of the statute is ambiguous, a court "can look to legislative history [citation] and to rules or maxims of construction" to resolve the ambiguity.  (*People v. Smith* (2004) 32 Cal.4th 792, 798.)  Further, any ambiguities in a statute "are not interpreted in the defendant's favor if such an interpretation would provide . . . a result inconsistent with apparent legislative intent."  (*People v. Cruz* (1996) 13 Cal.4th 764, 783.)

Assembly Bill 1869 reflects a legislative intent to address retroactive application of its terms, similar to the voter enactment at issue in *People v. Conley* (2016) 63 Cal.4th 646, 657 (*Conley*).  The voter enactment at issue in *Conley* was "not silent on the question of retroactivity," but instead, "expressly addresses the question [of retroactivity] in section 1170.126, the sole purpose of which is to extend the benefits of the Act retroactively." (*Ibid*.)  The *Conley* court noted that, "By its terms, the provision [addressing retroactivity] draws no distinction between persons serving final sentences and those serving nonfinal sentences, entitling both categories of prisoners to petition courts for recall of sentence under the Act." (*Ibid*.)  Similarly, Assembly Bill 1869, through the enactment of Government Code section 6111, distinguishes between fees paid by convicted individuals pursuant to fee orders made under the repealed fee statutes *prior* to July 1, 2021, and those fees that *remain outstanding* as of July 1, 2021.  Assembly Bill 1869 makes the legislative intent clear, stating:  "It is the intent of the Legislature to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and *to eliminate all outstanding debt incurred as a result of the imposition of administrative fees*."  (Stats. 2020, ch. 92, *supra*, § 2, italics added.)  In order to eliminate the "outstanding debt incurred" by defendants as a result of the

54

imposition of the repealed fee provisions, the Legislature enacted Government Code section 6111, which provides in relevant part: *"On and after July 1, 2021, the unpaid balance of any court-imposed costs* pursuant to [former Government Code] Section . . . 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, *is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."* (Gov. Code, § 6111, subd. (a), italics added.) By specifying the precise date on which the costs that have been imposed on defendants pursuant to former Government Code "Section 29550, and Sections 29550.1, 29550.2, and 29550.3," become unenforceable and uncollectible, the Legislature made clear that any amounts paid prior to that time need not be vacated, regardless of whether the sentence of the person on whom the costs were imposed is final.

Because Government Code section 6111 indicates a legislative intent to extend the ameliorative changes in the law regarding the imposition of administrative fees to individuals serving both final and nonfinal sentences, but only to the extent of relieving those individuals of the burden of any debt that remains unpaid on and after July 1, 2021, the rule announced in *Estrada* does not apply,[20] and Smith is entitled to have only that portion of

---

[20] In *Estrada*, the Supreme Court determined that " '[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply,' including 'to acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' " (*Conley, supra*, 63 Cal.4th at p. 656, citing *Estrada, supra*, 63 Cal.2d at p. 745.) The *Estrada* rule "rests on an inference that, *in the absence of contrary indications*, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*Conley,* at p. 657, italics added.) Where the

55

the fee imposed pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021 vacated as a result of the recent change in the law.

We do not agree with the People's contention that affirmance of the judgment is appropriate on the ground that Smith will receive automatic relief from collection of the unpaid portion of the fee that remains as of July 1, 2021. Although no further collection of any unpaid portion of the fee may occur as of July 1, 2021, pursuant to the express terms of Government Code section 6111, subdivision (a), Smith is entitled to the vacatur of that portion of the criminal justice administration fee imposed pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021, and to the modification of his judgment consistent with such vacatur. Government Code section 6111, subdivision (a) provides not only that any costs imposed pursuant to the listed statutory provisions that remain unpaid on and after July 1, 2021 are "unenforceable and uncollectible," but also that "any portion of a judgment imposing those costs *shall be vacated.*" (Gov. Code § 6111, subd. (a), italics added.) Thus, by its express terms, Government Code section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word "shall." (See, e.g., *Mostafavi Law Group, APC v. Larry Rabineau, APC* (2021) 61 Cal.App.5th 614, 622 [noting that courts generally construe the word "shall" as mandatory].)[21] Although Government Code section 6111's reference to

_____

Legislature has chosen to indicate how broadly or narrowly it wants to extend the application of an ameliorative change in the law, however, as the Legislature has done here through Government Code section 6111, there is no need to apply the *Estrada* presumption.

[21] We do not intend to suggest that an individual whose sentence is final must seek the vacatur of any unpaid fees from a court in order to obtain the

"those costs" is ambiguous, in that "those costs" could refer to the entirety of the fee imposed by the trial court, such that the vacating of "those costs" would eliminate the fee in its entirety, we conclude that the statutory scheme supports interpreting the phrase "those costs" as referring only to that portion of fee imposed by the court that *remains unpaid* as of July 1, 2021. (See Stats. 2020, ch. 92, *supra*, § 2 [intent of the Legislature is to "eliminate all *outstanding debt* incurred as a result of the imposition of administrative fees"].)[22] We therefore vacate any balance of the costs imposed by the court pursuant to former Government Code section 29550.1 that remains unpaid as of July 1, 2021.

---

ameliorative benefit of Government Code section 6111. By operation of law, any fees imposed pursuant to former Government Code sections 27712, subdivisions (c) or (f), 29550, 29550.1, 29550.2, and 29550.3 that remain unpaid as of July 1, 2021 are unenforceable and uncollectible. As a result, as the People correctly contend, any individual whose sentence is final will not be required to pay the remaining balance of such fees, regardless of whether that remaining balance is formally vacated by a court. However, given the language of Government Code section 6111, a defendant whose judgment is on appeal and who requests the vacatur of any remaining unpaid fees is entitled to have vacated any portion of the fees imposed pursuant to any of the statutes identified in Government Code section 6111 that remain unpaid as of July 1, 2021, rather than having his sentence affirmed.

[22] Smith appears to concede that he is entitled to the vacatur of only that portion of the former Government Code section 29550 fee that remains unpaid as of July 1, 2021, in that he requests that this court "direct the trial court to vacate the portion of the judgment ordering collection of any *unpaid debt* related to that fee." (Italics added.)

IV.

DISPOSITION

The portion of criminal justice administration fee imposed by the court pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021 is vacated. The judgment is affirmed as so modified.

The matter is remanded to the trial court with directions to amend the abstract of judgment to reflect the vacatur of any balance of the fee imposed pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021. The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

DATO, J.